Judgment rendered October 1, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,427-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                        Plaintiff-Appellee

versus

AHKEEM JAMAL WIGGINS, JR.                    Defendant-Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 401,201

Honorable Donald Edgar Hathaway Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT                Counsel for
By: Annette Fuller Roach                            Defendant-Appellant


JAMES EDWARD STEWART, SR.                  Counsel for
District Attorney                                        Plaintiff-Appellee

JASON WAYNE WALTMAN
MARGARET E. RICHIE GASKINS
ASHLIN NICOLE THOMAS
Assistant District Attorneys

* * * * *

Before STONE, ROBINSON, and HUNTER, JJ.

**HUNTER, J.**

Defendant, Ahkeem Jamal Wiggins, Jr., was charged by bill of information with battery of a pregnant dating partner, in violation of La. R.S. 14:34.9(K), and battery of a dating partner by strangulation, in violation of La. R.S. 14:34.9(L). Following a jury trial, he was found guilty as charged. Defendant was sentenced to serve three years at hard labor without the benefit of probation, parole, or suspension of sentence for each count. The sentences were ordered to be served consecutively with each other and any other sentence. For the following reasons, we affirm.

## FACTS

Defendant, Ahkeem Jamal Wiggins, Jr., and the victim, Ebony Baker, were childhood friends who reconnected in 2023. Ms. Baker was married to another man, but she and her husband were estranged. By February 2024, defendant and Ms. Baker were involved in a relationship, which Ms. Baker described as "dating," "courting," "getting to know each other," and "having sex." She had two children from previous relationships, and she was pregnant with defendant's child. Defendant was aware of Ms. Baker's marital status and that he was the father of her unborn child. He accompanied her to several obstetric appointments. Over time, Ms. Baker ceased being sexually intimate with defendant because she "didn't want to make a wrong judgment [about] being in a relationship with him."

On February 24, 2024, Ms. Baker informed defendant that she was planning to move to Houston, Texas the following year, and according to Ms. Baker, the conversation did not end well. On the morning of February 25, 2024, defendant and Ms. Baker exchanged text messages and that evening, she and some of her family members went to dinner at a restaurant.

As Ms. Baker was driving home from the restaurant, defendant called her to continue the conversation about her moving to Texas. Defendant requested to meet with Ms. Baker to continue the conversation in person; however, she declined to do so.

Ms. Baker drove home while talking to a friend on her cellphone. Within minutes of her pulling into her driveway, defendant pulled into the driveway behind her. Ms. Baker exited her car, admonished defendant about coming to her home unannounced, and told him to leave. Ms. Baker got back into her car and attempted to close the door. Defendant reopened the door, and Ms. Baker told him to leave her alone; defendant refused and remained in the doorway of her vehicle. Ms. Baker attempted to push defendant out of her way so she could exit her vehicle. Defendant grabbed Ms. Baker around her neck and began to strangle her. According to Ms. Baker, defendant strangled her "so hard that [she] couldn't breathe." As he was strangling her, defendant told her he was a "different breed," and he stated, "I'll kill you. I'll kill you."

Eventually, Ms. Baker managed to extricate herself from defendant. However, as she attempted to move away from him, defendant grabbed her, and they both fell to the ground. While on the ground defendant put Ms. Baker in a headlock, by placing his arm around her throat, and attempted to strangle her again. After a struggle, Ms. Baker escaped the headlock, but defendant wrapped his legs around her torso and began to squeeze her body using his legs. Ms. Baker cried out that defendant was hurting her and begged him to let her go; yet, he refused to release her. According to Ms. Baker, defendant stated, "Oh, you think you're going to kill my baby? I'll kill you and this baby." Defendant released Ms. Baker after she verbally

2

placated him by agreeing to talk with him. The two of them had a conversation, and defendant left Ms. Baker's home.

The entire incident was captured by Ms. Baker's Ring Doorbell camera and a security camera installed underneath her carport. The video clearly depicted defendant holding Ms. Baker by her neck and lifting her off the ground. The recording also captured defendant stating to Ms. Baker, "I'm a different breed. I'm a different breed. I'll kill you. I'll kill you." Both of defendant's hands were wrapped around Ms. Baker's neck while he made the threats.[1]

After defendant left Ms. Baker's home, she called the Shreveport Police Department ("SPD") to report the incident, and Officer James Oates responded to the call. When Officer Oates arrived, he observed scratches on Ms. Baker's face, and he documented her statement.

In April 2024, defendant was interviewed by Detective Kimberly Monereau of the SPD. After being advised of his *Miranda* rights and signing a waiver of rights form, defendant stated that he and Ms. Baker had been sexual partners and were expecting a child together. He also asserted that Ms. Baker described their relationship as "friends with benefits," and she had expressed concerns about having the baby because she did not want to have children "from different fathers." Defendant also stated that tensions arose because he wanted to raise his unborn child in the same household as Ms. Baker, but she did not want to live together.

---

[1] The video footage was admitted into evidence and played for the jury at trial. During her testimony, Ms. Baker identified herself and defendant as the people depicted in the video.

During the interview, defendant recounted his version of the incident. He stated that he was "triggered" when Ms. Baker pushed him twice, and he responded by grabbing her by her neck. Defendant denied choking Ms. Baker, and, initially, he denied threatening to kill her. However, after the officers confronted him with the video surveillance footage, he admitted to that he threatened to kill Ms. Baker "in the heat of the moment." Additionally, defendant stated that it was Ms. Baker who pulled him to the ground. According to defendant, Ms. Baker bit him, and he responded by biting her back. He denied using his legs to squeeze Ms. Baker around her abdominal area. Although defendant apologized for his actions, he stated the only reason he was in jail was "because of a woman who is traumatized" by her past relationships.

Defendant was charged by bill of information with battery of a dating partner (while pregnant), in violation of La. R.S. 14:34.9(K), and battery of a dating partner (strangulation), in violation of La. R.S. 14:34.9(L). A jury trial was held on October 24, 2024.

During the trial, Ms. Baker testified as to the events that transpired on February 25, 2024. Officer Oates and Det. Monereau also testified about their investigation of the incident.

Defendant declined to testify in his defense. However, against the advice of counsel, defendant addressed the trial court and stated that he wanted his grandmother, Annie Wiggins, to testify as a character witness. The trial court allowed Ms. Wiggins to testify, and she testified that she raised defendant, and he lived with her until he was 16 or 17 years old. She stated defendant had a good heart, and she had never known him to be abusive, violent, or disrespectful. During her testimony on cross-

4

examination, Ms. Wiggins admitted that she knew defendant had a prior conviction for armed robbery, and she heard he had been convicted of introducing contraband into a correctional facility.

The unanimous jury found defendant guilty as charged. The trial court denied defendant's motions for post-verdict judgment of acquittal and new trial. Defendant was sentenced to three years' imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence for each count. The sentences were ordered to be served consecutively with each other and any other sentence.[2] The trial court denied defendant's motion to reconsider sentence.

Defendant appeals.

## DISCUSSION

Defendant contends the evidence was insufficient to support the convictions. He argues the State failed to prove, beyond a reasonable doubt, that defendant and Ms. Baker were "dating partners," which is a necessary element of the offense. Defendant asserts he and Ms. Baker had engaged in sexual intercourse "a few times," and they conceived their child during this "brief period of intimacy." According to defendant, Ms. Baker was still legally married to another man, and she did not want her relationship with defendant to go any further.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v.*

---

[2] At the time the instant offenses were committed, defendant was on parole after serving 13 years in prison for armed robbery.

*Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified in La. C. Cr. P. art. 821, does not afford the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 3/28/03), 849 So. 2d 566, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed 2d 90 (2004).

As stated above, defendant was convicted of battery of a pregnant dating partner and battery of a dating partner by strangulation. La. R.S. 14:34.9(B)(3) provides, in pertinent part:

> "Dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not include a

casual relationship or ordinary association between persons in a business or social context.

In *State v. Smith*, 23-399 (La. App. 5 Cir. 12/27/23), 380 So. 3d 109, the defendant appealed his conviction for battery of a dating partner, arguing the victim did not meet the definition of "dating partner." During the trial, the victim was asked whether she and the defendant were involved in a "romantic relationship," and she responded, "We were just having sex." The defendant argued that a casual and purely sexual relationship did not meet the definition of "dating partner." The Court stated:

> [T]he two factors that encompass a "dating partner" are: 1) a past or current sexual or intimate relationship, and 2) an expectation of affectionate involvement.
> ***
> For purposes of statutory interpretation, courts have commonly used dictionaries as a valuable source for determining the "common and approved usage of words." Black's Law Dictionary defines "expectation" as "1. The act of looking forward; anticipation. 2. A basis on which something is expected to happen; esp., the prospect of receiving wealth, honors, or the like." The term "affection" is defined as "a feeling of liking and caring for someone or something: tender attachment: fondness." Black's Law Dictionary defines "affection" as "[f]ond attachment, devotion, or love." Finally, the term "involved" is defined as "having a part in something: included in something: actively participating in something: having a romantic or sexual relationship." Therefore, considering the common usage of the words included in the phrase "expectation of affectionate involvement," we interpret that phrase to mean the prospect of liking someone or something that also includes having a romantic or sexual relationship.

*Id*. at 115-6 (internal citation and footnotes omitted).

The Court concluded the State met its burden of proving the defendant and the victim were dating partners as defined in the statute. The Court considered the following facts: the defendant and the victim were romantically involved for approximately two years; they texted and called

7

each other; the defendant had a key to the victim's home; the victim chauffeured the defendant upon request; the defendant and the victim "hung out" together; and the victim would bring the defendant to the home where her children were present.

In the instant case, Ms. Baker admitted that she did not want to be involved in a committed relationship with defendant. Nevertheless, she used the terms "dating" and "courting" to describe her relationship with defendant. Additionally, the jury was able to view the video of defendant's interview with law enforcement officers. During the interview, defendant described his relationship with Ms. Baker as "complicated." He stated he and Ms. Baker spent a lot of time together, they texted and called each other, and he sometimes spent the night at her home where her children were present. Defendant expressed his desire to live in the same household as Ms. Baker so they could raise their unborn child together. Defendant further stated that he spent the night at Ms. Baker's residence, and he would assist her children, particularly her four-year-old son, in getting ready for school to allow Ms. Baker to rest in the mornings. He also asserted that Ms. Baker's 12-year-old son had expressed confusion because although his mother told him that defendant was her "friend," the child had witnessed intimate and affectionate gestures between his mother and defendant.

We have reviewed this record in its entirety. According to Ms. Baker's testimony and the defendant's description of the relationship, it is clear that defendant and Ms. Baker "ha[d] been involved in a sexual relationship with an expectation of affectionate involvement independent of financial considerations." Consequently, based on our review of this record and the applicable law, we find the evidence was sufficient to support the

8

jury's determination that defendant and Ms. Baker were "dating partners," within the meaning of La. R.S. 14:34.9.

Defendant also contends the evidence was insufficient "to overcome Ms. Baker's implied consent to the battery." He argues his verbal disagreement with Ms. Baker did not become physical until she pushed him twice and "got in his face." According to defendant he merely reacted by grabbing her around her neck.

Battery of a dating partner is the intentional use of force or violence committed by one dating partner upon the person of another dating partner. La. R.S. 14:34.9(A). In a non-homicide situation, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances; and second, a subjective inquiry into whether the force used was apparently necessary. *State v. Walker*, 53,975 (La. App. 2 Cir. 6/30/21), 321 So. 3d 1154, *writ denied*, 21-01334 (La. 11/23/21), 328 So. 3d 83; *State v. Broadway*, 53,105 (La. App. 2 Cir. 1/15/20), 288 So. 3d 903, *writ denied*, 20-00372 (La. 7/24/20), 299 So. 3d 78; *State v. Jackson*, 51,575 (La. App. 2 Cir. 9/27/17), 244 So. 3d 764. In any criminal proceeding in which the justification of self-defense is raised, the state shall have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. La. C. Cr. P. art. 390.

We find that the evidence adduced at trial does not support defendant's claim that he acted in self-defense. Ms. Baker testified that defendant arrived at her house unannounced, after she expressly told him not to do so, and she told him to leave several times before the physical altercation began. She stated she was seated in her vehicle, and defendant blocked her escape by standing in the doorway of the vehicle. Ms. Baker,

9

who is 5'2" tall, repeatedly told the 6'4" defendant to leave, and she attempted to push him out of her way so she could exit the vehicle. The video showed that defendant responded by grabbing Ms. Baker by her neck, briefly lifting her off the ground by her neck, and threatening to kill her. As she attempted to extricate herself from defendant's grip, they fell to the ground, where defendant continued to strangle her by placing her in a headlock, while simultaneously using his legs to pin her down. While the defenseless Ms. Baker struggled against his grasp, she repeatedly told him, "Stop Ahkeem."

Under the facts of this case, we find the evidence adduced at trial was sufficient to satisfy the elements of battery of a pregnant dating partner by strangulation. The jury was able to weigh the evidence presented and arrive at the conclusion that defendant's use of force was unreasonable and unnecessary under the circumstances. This assignment lacks merit.

Defendant further contends the trial court abused its discretion when it allowed him, rather than his trial counsel, to decide to call his grandmother, Ms. Wiggins, to testify as a character witness. He argues the testimony of Ms. Wiggins led to the impermissible introduction of other crimes evidence, *i.e.*, his criminal history. Defendant also argues that trial management was in the province of his counsel, who was responsible for deciding which witnesses to call, what arguments to pursue, what evidentiary objections to raise, and what evidence to introduce.

In the instant case, after the State concluded its case, the following colloquy occurred:

COUNSEL:    Your Honor, I don't anticipate calling any witnesses –

| | |
|---|---|
| COURT: | And do you wish to testify? |
| DEFENDANT: | No, Your Honor, I don't wish to testify, but I would like the character witness that's here on my behalf to make a statement as far as my character. |
| COURT: | Is there a character witness? |
| COUNSEL: | There is, Your Honor, and we had initially considered calling her, although it is my determination that it would be best for Ms. Wiggins' case that I not call her. |
| COURT: | I think he's got a – I mean, if that's what he wishes to do. I think you're going to have to do it. |
| COUNSEL: | Okay – |
| COURT: | [T]he defendant has the right to present his case the way he wishes. I mean, if that's what he wishes to do. I think you have to do it but note for the record that it's against it's over the – or against the advice of counsel. |
| COUNSEL: | Thank you, Your Honor. |

***

The Sixth Amendment to the United States Constitution and Article I,

Section 13 of the Louisiana Constitution guarantee a criminal defendant's

right to the effective assistance of counsel. *Gideon v. Wainwright*, 372 U.S.

335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *State v. Brooks*, 94-2438 (La.

10/16/95), 661 So. 2d 1333; *State v. Bayles*, 53,696 (La. App. 2 Cir.

11/17/21), 329 So. 3d 1149. To gain assistance of counsel, a defendant need

not surrender control entirely to counsel. In granting to the accused

personally the right to make his defense, the Sixth Amendment "speaks of

the 'assistance' of counsel, and an assistant, however expert, is still an

assistant." *McCoy v. Louisiana*, 584 U.S. 414, 421, 138 S. Ct. 1500, 1508,

200 L. Ed. 2d 821 (2018), quoting *Faretta v. California*, 422 U.S. 806, 819-

11

820, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). The Sixth Amendment "contemplates a norm in which the accused, and not a lawyer, is a master of his own defense." *McCoy v. Louisiana*, 584 U.S. at 422, quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 382, n. 10, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979).

In the instant case, in lieu of testifying in his own defense, the defendant, whose competency was never questioned throughout these proceedings, opted to have his grandmother testify "on [his] behalf to make a statement as far as [his] character." The defendant has the undeniable right to make decisions regarding his own defense, and based on this record, we see no abuse of the trial court's discretion in granting defendant's request to allow Ms. Wiggins to testify.

Moreover, the erroneous introduction of other crimes evidence is a trial error, *i.e.*, an error which occurs during the case's presentation to the trier of fact, which may be quantitatively assessed in the context of the other evidence. As such, it may be reviewed for harmless error. *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So. 2d 94; *State v. Allen*, 54,153 (La. App. 2 Cir. 12/15/21), 331 So. 3d 1101; *State v. Floyd*, 51,869 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1165, *writ denied*, 18-1292 (La. 2/25/19), 266 So. 3d 288. In this context, the proper analysis for harmless error review is to determine whether the guilty verdict actually rendered at trial was surely unattributable to the erroneous admission of other crimes evidence. *See*, *State v. Allen*, *supra*; *State v. Kurz*, 51,781 (La. App. 2 Cir. 2/28/18), 245 So. 3d 1219, *writ denied*, 18-0512 (La. 1/18/19), 262 So. 3d 285, and *writ denied*, 18-0529 (La. 3/25/19), 267 So. 3d 598, *cert. denied*, 587 U.S. 973, 139 S. Ct. 1624, 203 L. Ed. 2d 905 (2019).

The jury heard the testimony of Ms. Baker, reviewed the surveillance footage of the attack, and reviewed defendant's videotaped interview with law enforcement. During his interview, defendant mentioned that he had reconnected with Ms. Baker after serving 13 years in prison. There is no indication that the jury's verdicts were attributable to Ms. Wiggins' testimony regarding defendant's criminal history. Consequently, defendant has not shown he was prejudiced by Ms. Wiggins' testimony regarding his criminal history. This assignment lacks merit.

Defendant further contends the trial court abused its discretion in imposing consecutive maximum sentences of three years without the benefit of probation, parole, or suspension of sentence. Therefore, the sentences constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution. Defendant argues that he acted "under strong emotions," but he is not the worst offender, and this is not the worst offense to justify consecutive maximum sentences.

The law concerning excessive sentences is well-settled. Claims are reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1, and whether the sentence is constitutionally excessive. *State v. Vanhorn*, 52,583 (La. App. 2 Cir. 4/10/19), 268 So. 3d 357, *writ denied*, 19-00745 (La. 11/19/19), 282 So. 3d 1065. A review of the sentencing guidelines does not require a listing of every aggravating or mitigating circumstance. *Id.* The goal of La. C. Cr. P. art. 894.1 is to articulate an adequate factual basis for the sentence, not to achieve rigid or mechanical compliance with its provisions. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. West*, 53,526 (La. App. 2 Cir.

6/24/20), 297 So. 3d 1081. There is no requirement that any specific factor be given any particular weight at sentencing. *State v. Taves*, 03-0518 (La. 12/3/03), 861 So. 2d 144.

A sentence violates La. Const. art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 18-2052 (La. 4/15/19), 267 So. 3d 1131. To constitute an excessive sentence, a reviewing court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock the sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and, therefore, is nothing more than the needless imposition of pain and suffering. *State v. Griffin*, 14-1214 (La. 10/14/15), 180 So. 3d 1262; *State v. Efferson*, *supra*.

The trial court has wide discretion in the imposition of sentences within the statutory limits, and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116; *State v. Efferson*, *supra*. Generally, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. *State v. Cozzetto*, 07-2031 (La. 2/15/08), 974 So. 2d 665. On review, an appellate court does not determine whether another sentence may have been more appropriate but whether the trial court abused its discretion. *Id.*; *State v. McKeever*, 55,260 (La. App. 2 Cir. 9/27/23), 371 So. 3d 1156, *writ denied*, 23-01429 (La. 4/16/24), 383 So. 3d 149.

When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment

shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883.  It is within the court's discretion to make sentences consecutive rather than concurrent.  *State v. Dunams*, 55,443 (La. App. 2 Cir. 1/10/24), 379 So. 3d 251, *writ denied*, 24-00205 (La. 9/17/24), 392 So. 3d 632; *State v. Robinson*, 49,677 (La. App. 2 Cir. 4/15/15), 163 So. 3d 829, *writ denied*, 15-0924 (La. 4/15/16), 191 So. 3d 1034; *State v. Dale*, 53,736 (La. App. 2 Cir. 1/13/21), 309 So. 3d 1031. Concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive sentences under those circumstances are not necessarily excessive.  *State v. Dunams*, *supra*; *State v. Hebert*, 50,163 (La. App. 2 Cir. 11/18/15), 181 So. 3d 795.

When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms.  *State v. Dunams*, *supra*; *State v. Wing*, 51,857 (La. App. 2 Cir. 2/28/18), 246 So. 3d 711.  However, the failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. *State v. Kennon*, 50,511 (La. App. 2 Cir. 4/13/16), 194 So. 3d 661, *writ denied*, 16-0947 (La. 5/19/17), 220 So. 3d 747.

At the time defendant committed these offenses, La. R.S. 14:34.9(K) provided:

> Notwithstanding any provision of law to the contrary, if the victim of the offense is pregnant and the offender knows that the victim is pregnant at the time of the commission of the offense, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years.

La. R.S. 14:34.9(L) provided:

Notwithstanding any provision of law to the contrary, if the offense involves strangulation, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years.

Prior to imposing sentence, the trial court considered the factors set forth in La. C. Cr. P. art. 894.1. Namely, the court considered defendant's personal, family, educational, and criminal background. The record reveals that defendant received his GED and welding certification while he was incarcerated for the prior armed robbery, and he was enrolled in barber school when he committed the instant offenses. At the time of the offenses, defendant was unemployed and living with his mother, stepfather, and sister. At the time of sentencing, defendant was 34 years old, and he was the father of Ms. Baker's two-month-old daughter.

The trial court also considered the following aggravating factors: (1) defendant's conduct during the commission of the offenses manifested deliberate cruelty to the victim; (2) defendant used threats of or actual violence in the commission of the offenses; and (3) defendant was convicted of armed robbery in 2009, had been on "good time parole supervision" since January 6, 2023, and was on parole when he committed the instant offenses. The trial court found that none of the mitigating factors applied. The court stated:

> [I]n your own words you stated that you were a different breed and you're capable of killing in anger. Society is not safe with you on the streets. These sentences will run consecutive[ly], and they will run consecutive[ly] to your parole, whatever you're backing up on parole.

After reviewing this record, we find the sentences were amply supported by the record. The trial court properly considered aggravating factors and found that no mitigating factors applied. The record reveals that

defendant grabbed a pregnant Ms. Baker by her neck with both hands, lifted her off the ground by her neck, and threatened to kill her. Although defendant expressed remorse for his actions during sentencing, he attempted to minimize his behavior by stating he acted "out of emotions and not intentionally" because he "was enraged."

Further, although the record reflects the convictions arose from the same act/transaction, we find the trial court did not abuse its discretion in ordering the sentences to run consecutively. The trial court thoroughly discussed the applicable sentencing factors, including defendant's violent actions and threats to kill Ms. Baker. Considering the entirety of the record before us and the wide discretion afforded to the sentencing court, we cannot say the trial court abused its discretion in imposing the consecutive three-year sentences in this case. Thus, this assignment lacks merit.

## CONCLUSION

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

**AFFIRMED.**